UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

GLINDA DAVIS,                          )
                                       )
              Plaintiff,               )
                                       )
v.                                     )        No.:  3:12-CV-441-TAV-HBG
                                       )
U.S. BANK and THE HARTFORD,            )
                                       )
              Defendants.              )

## MEMORANDUM OPINION

This civil action is before the Court on Hartford's[1] Motion for Judgment on the Record [Doc. 20], U.S. Bank's Motion for Judgment on the Record [Doc. 23], and plaintiff's Motion for Judgement [sic] on the Administrative Record [Doc. 26]. Defendants have filed responses in opposition to plaintiff's motion [Docs. 28, 29]. Plaintiff did not respond to defendants' motions or reply to defendants' responses, and the time for doing so has passed.  *See* E.D. Tenn. L.R. 7.1(a), 7.2.  Therefore, all of the motions are now ripe for determination.

The Court has carefully considered the parties' filings in light of the administrative record and the applicable law.  For the reasons that follow, plaintiff's motion will be denied, defendants' motions will be granted, and the case will be dismissed.

---

[1] Hartford indicates that its proper name is "Hartford Life and Accident Insurance Company," not "The Hartford" [Doc. 20].  For purposes of this opinion, this defendant will simply be referred to as "Hartford."

# I.    Standard of Review

It is undisputed that plaintiff's claim to recover benefits under the terms of a short-term disability plan (the "STD Plan") funded by her former employer, U.S. Bank, is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* [Docs. 25 p. 2, 27 p. 1].   Because this is an ERISA case, "the summary judgment procedures set forth in [Federal] Rule [of Civil Procedure] 56 are inapposite to ERISA actions and thus should not be utilized in their disposition." *Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring in the judgment and delivering the opinion of the Court on the summary judgment issue); *see also Buchanan v. Aetna Life Ins. Co.*, 179 F. App'x 304, 306 (6th Cir. 2006) ("Traditional summary judgment concepts are inapposite to the adjudication of an ERISA action for benefits . . . because the district court is limited to the evidence before the plan administrator at the time of its decision . . . .").   Rather, the Court must review the administrative record and make findings of fact and conclusions of law. *Wilkins*, 150 F.3d at 619 (Gilman, J., concurring).

More particularly, this is an ERISA denial of benefits case.  In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, (1989), the Supreme Court held that a challenge to the denial of benefits under ERISA should "be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Where the plan administrator exercises discretion, a deferential, abuse of discretion—or arbitrary and

2

capricious—standard of review applies. *Id.* at 111. Plaintiff does not dispute that the "arbitrary and capricious standard" applies to the present matter based upon the terms of the STD Plan, and the Court agrees [Doc. 27 p. 1].[2] This Court may therefore disturb the benefits determination in this case only if it finds the basis of the determination to be arbitrary and capricious.

An administrator's decision on eligibility for benefits is not arbitrary and capricious if it is "'rational in light of the plan's provisions.'" *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991) (quoting *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988)). "This standard is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998) (citations and internal quotation marks omitted). Applying this standard of review requires that the "decision be upheld if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health and Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). Yet, "'merely because [the Court's] review must be deferential does not mean [the Court's] review must also be inconsequential. . . . [F]ederal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions.'" *Houston v. UNUM Life Ins.*

---

[2] Under the terms of the STD Plan, U.S. Bank "will have the sole authority, discretion and responsibility to interpret and apply the terms of the plans and to determine all factual and legal questions under the plans, including eligibility and entitlement to benefits" [AR p. 388].

3

*Co. of Am.*, 246 F. App'x 293, 299 (6th Cir. 2007) (alterations and omissions in original) (quoting *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005)).

## II.     Relevant Findings of Fact

The STD Plan provides benefits to eligible employees of U.S. Bank and is sponsored and funded by U.S. Bank, who is the "Plan Administrator and Plan Sponsor" and maintains ultimate authority over whether an employee is entitled to benefits [AR p. 388]. Hartford is a "Claims Administrator" for the STD Plan, which means that U.S. Bank has delegated to Hartford the authority "to interpret and construe the terms of the [STD Plan] and to determine all factual and legal questions under the [STD Plan] with respect to all initial claims for benefits and requests for review of adverse benefit determinations" [*Id.* at 390]. Hartford is only responsible for making the initial claims determinations and "first level appeals decisions," and the "U.S. Bank Disability Benefit Subcommittee" (the "Committee") "is charged with making final claims determinations" [Doc. 24 ¶¶ 2–3].

Pursuant to the STD Plan, to be eligible for benefits, one must either be totally disabled or partially disabled and:

- be covered under the STD plan;
- have satisfied the eligibility requirement for coverage;
- be under the regular care of a qualified doctor;
- be following a recommended course of treatment for [her] disabling condition; and
- provide upon request: proof of eligibility for benefits, including proof of continued disability; proof of the receipt or application for other income benefits such as social security benefits or Workers' Compensation; proof of examination by a doctor or, if

4

> requested, by an independent medical examiner; any other
> information requested to approve or continue your benefits.

[AR p. 375]. Here, plaintiff seeks total disability benefits, which requires a showing that she is "being treated for an illness, injury or pregnancy" and a finding by Hartford that she is "unable to perform the essential functions of [her] regular occupation, with reasonable accommodations, and, as a result, [her] current weekly earnings are less than 20% of [her] pre-disability earnings" [*Id.*].

Plaintiff was employed by U.S. Bank as a "Human Resources Generalist," which is a sedentary occupation, before she took a leave of absence on March 5, 2010, due to symptoms of depression [*Id.* at 367; Doc. 25 p. 5]. A March 5 medical record prepared by Dr. Robert Shutt ("Dr. Shutt"), plaintiff's family practice physician, reported that plaintiff had "some increased sadness, some anhedonia[,] as well as increased anxiety[,]" and had recently suffered "palpatations, some anxiety and some sweating" at work [AR p. 169]. Based upon these symptoms, Dr. Shutt "cleared [plaintiff] not to work for the next two weeks" [*Id.*].

Plaintiff had a history of depression and anxiety, but prior to March 2010, her condition was "well-controlled" by medication [*Id.* at 162; Doc. 25 pp. 5–6]. On March 8, 2010, Dr. Shutt executed an "Attending Physician Statement of Continued Disability for Mental Health" (an "APS") reporting that plaintiff's psychomotor activity was at a level of "retardation" [AR p. 210]. Moreover, Dr. Shutt noted that plaintiff had no ability to direct, control, or plan the activities of others, influence others, or perform effectively

5

under stress, and that her symptoms became "severe enough to preclude social/occupational functioning" on March 5, 2010 [*Id.* at 211].

On March 11, 2010, plaintiff received notice from Hartford that her claim for short-term disability benefits had been approved from March 5, 2010, through March 21, 2010, as Dr. Shutt had designated March 22, 2010, as plaintiff's anticipated return-to-work date [*Id.* at 43; Doc. 27 p. 2]. This notice from Hartford further states: "If you are unable to return to work on 3/22/10, please have your physician's office contact us to provide a complete medical update. Upon receipt of this information, we will review your file for additional benefits" [AR p. 43].

Based on plaintiff's March 19, 2010, visit, on March 25, 2010, Dr. Shutt executed an APS, reporting that plaintiff was suffering from "sadness; . . . sleep disturbance; [and] anxiety" [*Id.* at 209]. In this APS, Dr. Shutt stated that plaintiff "tells me the symptoms are bad [enough] that she can't work" and checked the "no" box in response to the question: "[i]s your patient able to return to work with accommodations?" [*Id.*]. Dr. Shutt also noted that plaintiff had been referred to a psychiatrist [*Id.*]. Accordingly, on March 29 and 31, 2010, Hartford faxed APS forms to Kellye Hudson ("Hudson"), a psychiatric mental health nurse practitioner, and David Maxey ("Maxey"), a licensed clinical social worker, who were reportedly treating plaintiff [Doc. 25 p. 7].

When Hartford had not received any additional information on plaintiff's health condition by April 2, 2010, it advised plaintiff that the March 25 APS from Dr. Shutt "was missing information needed to consider an extension of benefits" and that Hartford

had called the office of Hudson and Maxey and faxed APS forms to each, but had not received a response [AR p. 41]. More specifically, Hartford stated in this letter that the following information was necessary to determine whether plaintiff was disabled within the meaning of the STD Plan after March 21, 2010: "medical documentation from [plaintiff's] last office visits with Dr. Hudson and Mr. David Maxey including [plaintiff's] symptoms, treatment plan, treatment frequency, limitations, level of functionality and return to work plan" [*Id.*]. Because Hartford had not received this information, the letter relayed that plaintiff's claim had been closed [*Id.*]. Finally, the letter advised plaintiff that she could perfect her claim by submitting the required information, or appeal Hartford's determination without providing additional information [*Id.* at 41–42].

On or about April 7, 2010, Hartford received an APS completed by Maxey that stated that he examined plaintiff on March 23, 2010, and diagnosed her with major depressive disorder, recurrent, severe and generalized anxiety, and a GAF score of 50 [*Id.* at 206]. Regarding plaintiff's observable symptoms, Maxey recorded: "flat affect, anxious, pressured speech, watchful, [and] tearful throughout sessions" [*Id.*]. Maxey noted that plaintiff reported feeling "completely overwhelmed in her professional duties" and that she received minimal training before starting as a Human Resources Generalist [*Id.* at 207]. Though Maxey's report indicated that plaintiff had a minimal ability to direct or control others, perform effectively under stress, deal with other people, and make judgments and decisions, Maxey also noted that plaintiff was well-groomed,

7

cooperative, and that her thought process was logical and coherent [*Id.* at 206–07]. Finally, Maxey submitted that plaintiff's "[p]sychomotor activity" was at a level of "[r]etardation" [*Id.* at 206].

On or about April 9, 2010, Hartford received an APS completed by Hudson that diagnosed plaintiff with major depressive disorder and generalized anxiety disorder [*Id.* at 203]. Of note, Hudson stated that plaintiff reported having a "break" and charted plaintiff's symptoms as "depressed mood" and fear of failure, awarding a GAF score of 50 [*Id.*]. Further, Hudson reported that plaintiff complained during a March 29, 2010, evaluation of symptoms such as "shaking, inability to process information, feelings of dread, increased anxiety, depressed mood, isolating behavior, fatigue, and increased difficulty concentrating" [Doc. 27 p. 12]. Yet, Hudson noted, "no psychosis [was] observed" [AR p. 203], despite plaintiff's observed symptoms including "depressed mood, tearful[ness] at times, worried about failing, . . . [and] concentration impaired" [*Id.*]. Moreover, in charting plaintiff's "Mental Status Examination" on March 29, Hudson noted that plaintiff was nicely dressed and well-groomed, had "calm" motor activity, was cooperative, and had above average intellectual functioning and good concentration [*Id.* at 250]. Finally, Hudson reported on an APS regarding the March 29 examination that plaintiff's symptoms were not of such severity so as to preclude plaintiff from social or occupational functioning and that plaintiff had a psychomotor level within normal limits [*Id.* at 203].

Due to this "conflicting information . . . from [plaintiff's] providers" [*Id.* at 33], Hartford referred plaintiff's case to a behavioral health case manager, Kristen Piper ("Piper"), on or about April 13, 2010, and Piper requested more information from Maxey and Hudson [*Id.* at 342–43]. In response to a question inquiring whether plaintiff was capable of full-time occupational functioning, Hudson stated that she was "not able to answer this question" because she "met with [plaintiff] only once" and that plaintiff was suffering from mild to moderate anxiety and "mood disturbances," displaying symptoms in the form of tearfulness and anxiousness [*Id.* at 271–72]. As for whether she believed plaintiff could perform the duties of her occupation for a different employer, Hudson stated that she "cannot answer [because] [she was] not aware of [plaintiff's] specific job duties with [U.S. Bank]" [*Id.* at 272].

Based on Hudson's response, Piper concluded that the available information did not substantially indicate functional impairments [*Id.* at 338]. Therefore, in a letter dated April 21, 2010, Hartford notified plaintiff that she was not eligible for benefits beyond March 21, 2010, because she had not submitted information showing that her symptoms and impairments were so severe that they prevented her from working [*Id.* at 31–34]. This letter requested information from Maxey, who had not responded to the April 13 inquiry from Piper, and noted that plaintiff could alternatively appeal Hartford's decision [*Id.* at 34]. On April 28, 2010, Hartford spoke with plaintiff on the telephone and encouraged her to submit the requested information so that Hartford could review her case for a possible extension of benefits beyond March 21 [*Id.* at 330].

9

On May 11, 2010, Hartford received a response from Maxey dated April 16, 2010 [*Id.* at 261–62]. Maxey averred that plaintiff did not have full-time occupational functioning because of her poor memory, anxiety, poor concentration, fatigue, and her feeling that she is overwhelmed [*Id.* at 261]. Yet, Maxey stated that plaintiff would "be able to perform to duties of her own occupation as a HR representative for a different employer" and that he did not and would not "accept any implied responsibility for the granting or denial of [plaintiff's] benefits" [*Id.* at 262].

After receiving Maxey's response, Hartford again denied plaintiff's claim for benefits beyond March 21, 2010, in a May 17, 2010, letter, stating that "there were no noted objective or observable symptoms impacting [plaintiff's] functionality" and pointing out that Maxey indicated that plaintiff could perform her job duties for a different employer [*Id.* at 28]. Accordingly, Hartford concluded that there was no indication that plaintiff's symptoms or impairments prevented her from working beyond March 21.

Plaintiff notified Hartford of her intent to appeal the denial of benefits on May 20, 2010, and requested information pursuant to 29 C.F.R. § 2560.503 [*Id.* at 259]. On November 19, 2010, plaintiff submitted additional information in support of her claim for benefits [*Id.* at 237–51]. This information included witness statements averring that plaintiff had shown signs of depression and anxiety, plaintiff's representation that she suffered from neuropathy and severe carpel tunnel syndrome, and plaintiff's statement that she was experiencing side effects from medication such as loss of appetite, weight

10

gain, thoughts of suicide, and fatigue, among other symptoms [*Id.* at 240]. Moreover, plaintiff submitted documents memorializing an evaluation completed by Hudson on March 29, 2010, which diagnosed her with "generalized anxiety disorder" and "major depressive disorder" of the "simple, mild" variety and noted that plaintiff showed "no psychosis" and had good concentration, above-average intellectual functioning, and adequate judgment [*Id.* at 97].

Plaintiff submitted a plethora of records in support of her appeal, including records of her treatment with Maxey [*Id.* at 102–06]. These records indicated that plaintiff saw Maxey once in March 2010, five times in April 2010, and once in May 2010 before cancelling her May 18, 2010, appointment and ending her treatment with Maxey [*Id.* at 104–05]. A significant portion of the records from these meetings, which were composed by Maxey, relates to plaintiff's difficulty concerning the STD Plan benefits process [*Id.* at 105–06]. One excerpt, which summarizes a meeting on April 22, 2010, notes that plaintiff and Maxey "discuss[ed] her need to begin looking for another company [with which] to practice her profession" [*Id.* at 105].

Finally, a form restriction letter signed by Dr. Shutt on October 17, 2010, states that plaintiff must be able to miss work at any time to combat her symptoms and must avoid social contact with others [*Id.* at 80]. Further, this form states that plaintiff "could not work at any employment beginning March 5, 2010, and cannot work at any employment at this time. . . . [and] for the foreseeable future" due to the symptoms stemming from her anxiety and depression [*Id.*].

Based upon a review of plaintiff's claim file and the additional information provided in support of plaintiff's appeal, Hartford denied plaintiff's initial appeal, determining that "[t]here is no evidence to support disability from a physical perspective" and that "the medical information does not support [the assertion that plaintiff] was unable to perform the essential functions of her regular occupation, with reasonable accommodations[,] beyond March 21, 2010" [*Id.* at 21]. In support, Hartford noted that there were no records from Dr. Shutt after March 19, 2010, to buttress his conclusion of October 17, 2010, which Hartford found was "not supported by the medical evidence in the claim file," and Hartford added that the medical records from Hudson and Maxey were more recent and deserve more weight than Dr. Shutt's opinion because Hudson and Maxey specialize in assessing and treating mental health issues, while Dr. Shutt was plaintiff's family practice physician [*Id.* at 20–21]. Hartford also noted that plaintiff's "occupation" refers to "that in the general workplace and not for a specific employer" [*Id.* at 21]. The letter informing plaintiff of Hartford's denial of her initial appeal advised plaintiff that she could appeal to U.S. Bank, who would make the final determination as to her claim [*Id.* at 22].

Plaintiff gave notice of her intent to appeal Hartford's decision on January 27, 2011, and her counsel submitted the following question to Hartford: "could you advise us what particular tests or objective findings would support [plaintiff's] complaints and which would provide evidence of total disability?" [*Id.* at 72–73]. Defendants did not respond with specificity to this particular request. In connection with plaintiff's second

appeal to U.S. Bank, Hartford referred her claim to "Behavioral Medical Interventions," a third-party peer review entity, which hired Dr. Gregory Barclay ("Dr. Barclay"), a board-certified psychiatrist, to review plaintiff's records and provide his opinion [*Id.* at 62–63; Doc. 25 p. 13]. Dr. Barclay did not personally examine plaintiff [AR p. 68], and on this point, the STD Plan states that claimants may be required to undergo a physical examination by a physician selected by Hartford, or Hartford may hire an independent consultant to examine and review a claimant's records [*Id.* at 376].

Dr. Barclay was unable to reach Hudson despite several attempts and received only a returned voicemail from Maxey on April 19, 2011, in which Maxey stated that he had no opinion as to plaintiff's current ability to work and that "she seemed fine and not impaired when he saw her last year" [*Id.* at 64–65]. In addition, Dr. Barclay discussed plaintiff's case with Dr. Shutt for fifteen minutes on April 19, 2011, reporting that Dr. Shutt stated: "in his opinion, at no point in his contact with [plaintiff] did he believe her psychiatric issues would have prevented her from working[,] and she did not exert significant functional limitations in her ability to work" [*Id.* at 65]. Dr. Shutt also noted in this conversation that plaintiff had begun treatment with a psychiatrist, Dr. Jayne, which had purportedly improved her condition [*Id.*]. In terms of the records reviewed in preparing his report, Dr. Barclay stated that he reviewed the APS forms submitted by various medical providers, plaintiff's medical records, a psychiatric evaluation completed by Complete Counseling, a "Life Sync document," lab and diagnostic documents, internal and miscellaneous documents, and "[a]uthorizations" [*Id.* at 64].

13

After reviewing this information and receiving the aforementioned feedback from plaintiff's medical providers, Dr. Barclay noted that (1) neither plaintiff's therapist nor her nurse practitioner commented that she was "significantly impaired in her . . . ability to work," a view he submits was corroborated by Dr. Shutt in his reported conversation with Dr. Barclay, (2) plaintiff's medical providers did not document formal mental status examination findings, rating scales, or other objective measures of symptom severity, and (3) "there is no cognitive or psychological testing . . . to corroborate [plaintiff's] subjective complaints of impaired functioning" [*Id.* at 66–67].  Plaintiff submits that this view is contradicted by the previous forms and reports submitted by Dr. Shutt, Hudson, and Maxey, who reported bodily symptoms, GAF scores, plaintiff's appearance, and plaintiff's psychomotor activity level.  Also, plaintiff contends that Hartford never requested psychological testing despite the fact that U.S. Bank's policy allowed such and did not respond to plaintiff's inquiry as to the kind of objective findings that would support plaintiff's claim [Doc. 27, pp. 11–12].  Dr. Barclay acknowledged that "[t]here is consistency among the available medical records with regard to [plaintiff's] subjective complaints" [AR p. 67].  In sum, however, Dr. Barclay concluded that "[t]here is insufficient medical evidence to support impairment for the time frame in question" and "a lack of support for impairment from a psychiatric disorder," lamenting the lack of testing to corroborate plaintiff's subjective complaints or objectively measure symptom severity [*Id.* at 67–68].

14

At this point, Hartford forwarded plaintiff's file and information to U.S. Bank, along with its recommendation that U.S. Bank uphold the denial of disability benefits beyond March 21, 2010 [*Id.* at 6–7]. In a letter dated July 14, 2011, the Committee informed plaintiff that it was upholding the denial of STD Plan benefits beyond March 21, 2010, because it found that "the medical information is insufficient to support that [plaintiff] was experiencing symptoms of a psychiatric nature to such a severity that it precluded her from performing the essential duties of her own occupation for the period beyond March 21, 2010" [*Id.* at 3]. Thus, the decision to terminate benefits on that date was "appropriate" because the evidence is insufficient to support the conclusion that plaintiff continued to be totally disabled [*Id.* at 3]. Plaintiff filed her complaint against defendants in the General Sessions Court for Knox County, Tennessee, on September 13, 2011, and defendant filed a notice of removal on August 22, 2012 [Doc. 1 ¶ 1].

## III.    Conclusions of Law

While Hartford has asserted that it cannot be held liable because, pursuant to the terms of the STD Plan [Doc. 22 p. 7], it neither had the authority over the final decision to deny benefits nor is liable for any benefit payments, the Court need not address this argument in light of its finding that neither defendant acted in an arbitrary and capricious manner in relation to plaintiff's claim. U.S. Bank has moved for judgment on the record on the grounds that (1) plaintiff did not meet her burden of establishing that she was entitled to benefits beyond March 21, 2010, under the STD Plan, and (2) U.S. Bank's decision was based on the totality of the evidence after a fair and reasonable

15

investigation. Thus, U.S. Bank submits, its decision was not arbitrary and capricious and therefore cannot be disturbed.

Plaintiff has also moved for judgment on the record on the grounds that (1) she was denied a full and fair review of her claim, and (2) Hartford's demand for objective evidence was unreasonable given the terms of the STD Plan. More specifically, plaintiff submits that she was denied a full and fair review of her claim because (1) defendants ignored portions of the information from her medical providers, (2) did not respond to her inquiry as to which tests would substantiate her claim, and (3) failed to conduct a physical examination of plaintiff, instead relying on a record review that amounted to a credibility judgment. In addition, plaintiff alleges that Dr. Barclay's analytical framework had numerous factual errors, misunderstandings, and omissions. Finally, plaintiff alleges that Hartford's demand for objective evidence of plaintiff's disability, its refusal to tell plaintiff the objective evidence needed to prove she was entitled to benefits, and its failure to disclose Dr. Barclay's report until after the final denial of benefits were unreasonable, arbitrary, and capricious. Defendants responded in opposition to plaintiff's motion.

The record reveals that plaintiff was treated for psychiatric or psychological issues beginning around March 5, 2010, and received STD Plan benefits from U.S. Bank through March 21, 2010. Though defendants acknowledge that plaintiff consistently reported symptoms of depression and anxiety, they denied plaintiff's request for benefits beyond this date based upon their conclusion that plaintiff failed to provide sufficient

16

objective, medical evidence that her symptoms and impairments were of such a severity to render her unable to perform the essential functions of her job, viewed as a general occupation rather than her specific position with U.S. Bank.

U.S. Bank correctly states that plaintiff bears the "burden of producing evidence that she was disabled under the terms of the policy." *Rose v. Hartford Fin. Servs. Grp., Inc.*, 268 F. App'x 444, 452 (6th Cir. 2008). Moreover, plaintiff must show that defendants' denial of benefits was arbitrary and capricious. The record in this case contains evaluations and representations by various medical providers that often conflict both with the evaluations of the other providers, and previous or subsequent evaluations by the same provider.

For example, Hudson averred in an APS form that based on her March 29, 2010, examination of plaintiff, she did not believe plaintiff's symptoms were severe enough to preclude her from occupational functioning. Later, she stated that she could not opine as to whether plaintiff was capable of full-time occupational functioning because she only met plaintiff once and was unaware of plaintiff's job duties.

In addition, Maxey stated in an APS form that based on his meeting with plaintiff in late March 2010, plaintiff's symptoms were severe enough to preclude occupational functioning. Yet, when Hartford sought more information from Maxey in April 2010, he stated that plaintiff could perform the duties of her occupation with U.S. Bank for another employer, and records of his meetings with plaintiff reveal that he told plaintiff she needed to begin looking for a new job in which to practice her profession. These

observations bely Maxey's previous representation that plaintiff was unable to perform the essential functions of her job. When Dr. Barclay attempted to contact Maxey, Maxey replied with a voicemail stating that he had no opinion as to plaintiff's ability to work and that she did not seem impaired when he last saw her.

Further, Dr. Shutt indicated in an APS form completed on March 25, 2010, that plaintiff could not return to work, but this finding was based on his examination of plaintiff on March 19, 2010, when she was still receiving STD Plan benefits. On October 17, 2010, Dr. Shutt signed a form stating that plaintiff had been unable to work since March 5. Yet, Dr. Barclay spoke with Dr. Shutt about plaintiff's condition on April 19, 2011, and reported that Dr. Shutt stated that at no point did he believe plaintiff's symptoms would have prevented her from working and that she did not exert significant limitations in her ability to work.

Based on the inconsistencies in plaintiff's evidence, as well as defendants' consideration of the totality of the record in deciding to deny plaintiff's requested benefits, the Court finds that this decision was not arbitrary, capricious, or unreasonable. Though defendants acknowledge that plaintiff was diagnosed with depression and anxiety-related disorders, from which she had suffered since at least 2003, there is insufficient evidence in the record that the symptoms from these ailments rendered her unable to perform the essential functions of her job beyond March 21, 2010. In fact, some medical evaluations indicated that she was not unable to perform her occupational functions.

18

Moreover, defendants relied, at least in part, on the independent peer review conducted by Dr. Barclay in arriving at its decision to deny plaintiff's claim for benefits. After reviewing the applicable record and speaking, or attempting to speak, with Dr. Shutt, Hudson, and Maxey, Dr. Barclay concluded that while plaintiff's subjective symptoms were consistent, plaintiff had not presented sufficient objective, medical evidence indicating that her symptoms were so severe that she was unable to work. Given the record and the comprehensive investigation and analysis performed by U.S. Bank, and Hartford on its behalf, the Court finds that this explanation is rational and reasonable, and neither arbitrary nor capricious, under the circumstances.

1. **Plaintiff's Claim That She Was Not Afforded a Full and Fair Review**

Plaintiff contends that she did not receive a full and fair review of her claim, which includes the right to review all relevant documents and records and contemplates communication between the parties. *See Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) ("If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it."). Plaintiff claims that defendants ignored Dr. Shutt and Maxey's findings that she could not return to work and Hudson's finding that plaintiff was incompetent to sign checks or manage her funds. But as already noted, at other times, Dr. Shutt and Maxey stated otherwise or

19

averred that they could not opine as to whether plaintiff was capable of performing her essential job functions.

To this end, Hudson noted that "no psychosis [was] observed" on March 29, 2010, that plaintiff had above average intellectual functioning and good concentration, that plaintiff's symptoms were not of such severity so as to preclude plaintiff from social or occupational functioning, and that plaintiff had a psychomotor level within normal limits [AR pp. 203, 250]. Later, when asked whether plaintiff was capable of full-time occupational functioning, Hudson stated that she was "not able to answer this question" because she "met with [plaintiff] only once," and as for whether she believed plaintiff could perform the duties of her occupation for a different employer, Hudson stated that she "cannot answer [because] [she was] not aware of [plaintiff's] specific job duties with [U.S. Bank]" [*Id.* at 271–72].

Moreover, Maxey averred in a document completed on April 16, 2010, that although plaintiff did not have full-time occupational functioning because of her poor memory, anxiety, poor concentration, fatigue, and her feeling that she was overwhelmed, plaintiff would "be able to perform to duties of her own occupation as a HR representative for a different employer" and that he did not and would not "accept any implied responsibility for the granting or denial of [plaintiff's] benefits" [*Id.* at 261–62]. In a meeting on April 22, 2010, Maxey noted that he and plaintiff "discuss[ed] her need to begin looking for another company [with which] to practice her profession" [*Id.* at 105]. Further, Maxey told Dr. Barclay in April 2011 that he had no opinion as to

plaintiff's current ability to work and that "she seemed fine and not impaired when he saw her last year" [*Id.* at 64–65].

Such contradictions underscore the weakness of plaintiff's claim—she had the burden of proof as to her claim, and this Court may only overturn defendants' decision if it determines that the decision was arbitrary and capricious.

Plaintiff also takes issue with Dr. Barclay's finding that plaintiff had not supplied sufficient evidence of the severity of her symptoms, especially considering that plaintiff inquired, after her first appeal had been decided in January 2011, as to the tests or objective findings needed to support her claim, to which she apparently received no response from defendants. Yet, as U.S. Bank points out, it and Hartford provided detailed information as to the records considered in rendering their decisions and continually stated that plaintiff had not provided sufficient objective evidence regarding the severity of her symptoms.

Concerning plaintiff's argument that defendants did not comply with the communication mandates because they ignored her January 2011 inquiry as to what information or test results would support her appeal, the Court finds it is unsupported by the record. Letters sent to plaintiff on April 2, 2010 [Doc. 41], and January 13, 2011 [Docs. 19–21], denying her claim, as well as Dr. Barclay's report on April 27, 2011 [Doc. 64–68], consistently detail the items reviewed in arriving at the decision, the specific basis for the decision, and the type of information needed to perfect the claim. Moreover, as U.S. Bank notes, "[t]he administrator [must] describe what is required to 'perfect the

21

claim,' and that is not synonymous with 'win the appeal.'" *Dutton v. Unum Provident Corp./Paul Revere Co.*, 170 F. Supp. 2d 754, 760 (W.D. Mich. 2001) (quoting *Terry v. Bayer Corp.*, 145 F.3d 28, 39 (1st Cir. 1998)). The Court finds that defendants consistently described the information needed to perfect plaintiff's claim and the information considered in rendering each decision, and therefore the Court declines to find that plaintiff was not provided a full and fair review on this basis.

In addition, plaintiff argues that defendants acted in an arbitrary and capricious fashion by failing to conduct a physical examination of plaintiff. The Sixth Circuit has stated that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination" and that the decision to conduct a file review, as opposed to a physical examination, is just one factor for the Court to consider. *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). Still, "the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Id.* at 295–96. The STD Plan reserves such a right. In *Calvert*, the court found that the benefits determination had been arbitrary and capricious because the reviewing physician's conclusions indicated that he had not reviewed the entire record. *Id.* at 296. In particular, the reviewing physician: did not mention the surgical reports, x-rays, or CT scans in the record, did not address the contrary conclusions of the two doctors that met or examined the claimant and the Social Security Administration, and stated that no objective data supported plaintiff's claim that

22

her activities were restricted, despite the x-rays and CT scans in the record.  *Id.* at 296–97.

Conversely, Dr. Barclay: chronicled in detail the items reviewed in composing his report, attempted to speak, or did speak, with plaintiff's medical providers concerning her condition and ability to work, and acknowledged the medical facts or opinions supporting plaintiff's total disability claim.  To this end, Dr. Barclay noted plaintiff's history of depression and anxiety and the consistency of the records as to plaintiff's subjective complaints, but ultimately concluded that insufficient evidence existed to show that plaintiff's symptoms were so severe as to prevent her from working.  Consequently, the present record is inapposite to *Calvert*, where the reviewing physician's conclusions were plainly contradicted by the record.  On the contrary, there is no indication here that Dr. Barclay did not consider all of plaintiff's records or that he did not believe her symptoms.

Plaintiff further submits that because her ailment was psychiatric or psychological in nature, Dr. Barclay should have conducted a physical, or in-person, examination, relying upon *Smith v. Bayer Corp. Long Term Disability Plan*, 444 F. Supp. 2d 856, 873 (E.D. Tenn. 2006) (stating that courts often discount the opinions of psychiatrists who have not seen the patient because, unlike many types of medicine, psychiatry is largely dependent on interviewing and spending time with the patient).  In *Smith*, the reviewing physicians, who did not visit plaintiff, arrived at the opposite conclusion to the two physicians who did, and the reviewing physicians' reports contained statements that "border[ed] on the absurd" and were contradicted by the record.  *Id.* at 874–75.  The

23

Sixth Circuit affirmed this portion of the opinion, finding errors and omissions in the reviewing physicians' analytical framework and noting that "[a]n examination could have helped the plan administrator to better evaluate the severity of [plaintiff's] symptoms." *Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 503–04, 508 (6th Cir. 2008). Furthermore, in *Smith*, "the only evidence supporting the assertion that the plaintiff was able to resume his prior position as a pharmaceutical-sales representative was offered by individuals who never met personally with Smith, despite the difficulties in diagnosing psychological illnesses from cold medical records." *Id.* at 503–04.

Even if it would have been more prudent for Dr. Barclay to conduct a physical examination, by itself, this factor is not enough to overcome the totality of the evidence and the thorough, documented review by defendants, which led to a decision that was not arbitrary or capricious. Additionally, unlike in *Smith*, Dr. Barclay's conclusion did not directly contradict the conclusions of the examining medical providers, and Dr. Barclay consulted, or tried to consult, with the medical providers who treated plaintiff and recounted what he learned in his report.

Moreover, as mentioned, Dr. Barclay's report describes the portions of the record he reviewed, the aspects of the record supporting and belying plaintiff's claim, and the basis for his decision, arriving at a reasoned conclusion consistent with that reached by defendants throughout the claim process. Thus, the Court does not find that the analytical framework employed by defendants contains the sort of errors, misunderstandings, and omissions present in *Calvert* and *Smith*.

Finally, and perhaps most importantly, though the record contains evidence supporting plaintiff's claim that she was suffering from depression and anxiety, it also contains evidence indicating that plaintiff could have performed the essential functions of her occupation during the time frame in question, and thus, in contrast to *Smith*, the Court does not find that the only evidence supporting Dr. Barclay's conclusion came from individuals who never met with plaintiff. Therefore, the Court finds that, by itself, the fact that Dr. Barclay did not physically examine plaintiff does not render defendants' denial of benefits arbitrary or capricious.

Along similar lines, plaintiff contends that "where an administrator exercises its discretion to conduct a file review, credibility determinations made without the benefit of a physical examination support a conclusion that the decision was arbitrary." *Helfman v. GE Grp. Life Assur. Co.*, 573 F.3d 383, 395–96 (6th Cir. 2009). Here, plaintiff submits, defendants made such credibility determinations because they "did not believe [plaintiff] when she asserted that she could not work because of her depression and anxiety," rendering the denial of benefits arbitrary [Doc. 27 p. 17]. U.S. Bank argues that this language is inapplicable because Dr. Barclay did not determine that plaintiff was not credible—he readily acknowledged her history of depression and anxiety and the consistency of her subjective symptoms. Instead, he merely concluded that she did not provide sufficient evidence as to the severity of her symptoms. This does not amount to a credibility judgment that renders Dr. Barclay's findings, or those of defendants based on the totality of the record, arbitrary or capricious.

As a general matter, with regard to defendants' use of Dr. Barclay's review as support for their decisions, "plan administrators are not required to accord special deference to the opinions of treating physicians." *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 504 (6th Cir. 2010). And, "[r]eliance on other physicians is reasonable so long as the administrator does not totally ignore the treating physician's opinions." *Id.* Dr. Barclay and defendants expressly noted that they considered plaintiff's medical records and evaluations and acknowledged plaintiff's symptoms. Dr. Barclay consulted, or tried to consult, with plaintiff's medical providers to gather their opinions on plaintiff's condition and reviewed plaintiff's medical records, reports, and evaluations. Thus, it cannot be said that the opinions of plaintiff's treating medical providers were ignored.

The Court has found that none of the particularized concerns with using a non-treating physician's opinion, considered individually or collectively, overcome the deferential review standard and support in the record for the decision to deny plaintiff's claim for benefits. In addition, the Court does not find that Dr. Barclay's opinion, or defendants' reliance upon it, was unsupported by the record. Summarily, the Court finds that plaintiff received a full and fair review of her claim and that defendants did not act arbitrarily or capriciously in denying her claim.

### 2. Plaintiff's Claim That Hartford's Demand for Objective Evidence Was Unreasonable

Finally, plaintiff argues that defendants unreasonably "employed a game of 'hiding the ball'" by focusing on and requiring objective proof that plaintiff was unable to

26

perform the essential functions of her occupation when the STD Plan does not expressly require such and ignoring plaintiff's aforementioned request for the test results or information needed to support plaintiff's claim on her second appeal [Doc. 27 p. 18]. The latter argument has already been addressed, and as to the former, U.S. Bank correctly notes that "[r]equiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 166 (6th Cir. 2007); *see also Richards v. Johnson & Johnson*, 688 F. Supp. 2d 754, 787 (E.D. Tenn. 2010) (holding that "Defendant is entitled to request objective evidence of a claimant's subjective complaints and medical opinions based on those subjective complaints").

Requesting objective evidence had a clear purpose in this case—determining whether plaintiff was capable of performing the essential functions of her occupation. In addition, a "plan administrator [can] require objective evidence of a disability, . . . so long as the administrator notified the claimant that her file lacked the required objective evidence." *Huffaker v. Metro. Life Ins. Co.*, 271 F. App'x 493, 500 (6th Cir. 2008) (citation and internal quotation marks omitted). Communications from defendants to plaintiff are replete with such notifications in this case. Defendants were not unreasonable in requesting objective evidence, and their conclusion that plaintiff did not provide sufficient objective evidence that she was unable to perform the essential functions of her occupation was not arbitrary or capricious.

Plaintiff also submits that defendants acted unreasonably because the questions to which Dr. Barclay responded in his report were different than those sent to plaintiff's medical providers, and Dr. Barclay's report was not disclosed to plaintiff or her medical providers until after U.S. Bank's final denial of plaintiff's claim for benefits. As for the difference between the questions provided to treating medical providers at the fact-gathering stage of the claim and the questions provided to a reviewing physician after an initial determination and appeal, the Court finds that such a difference does not render the decision-making process arbitrary or capricious.

Moreover, concerning the disclosure of Dr. Barclay's report, U.S. Bank responds that plaintiff was notified of his review as it was ongoing and asked to assist in facilitating communication between Dr. Barclay and plaintiff's medical providers. Also, plaintiff did not request a copy of the report. The Sixth Circuit has stated that it is doubtful that plaintiffs have the right to discover documents generated within a pending administrative review, and even if such a right exists, the plaintiff must request a copy of the documents. *Balmert*, 601 F.3d at 503. There is no evidence that plaintiff made such a request. Accordingly, the Court finds that defendants did not act unreasonably in these respects and that plaintiff's arguments are without merit.

## IV.    Conclusion

In light of all the evidence in the record, defendants have demonstrated a rational, reasoned explanation for their decision, and thus the Court finds that their denial of plaintiff's claim for STD Plan benefits was supported by evidence in the record and was

28

not arbitrary or capricious. Therefore, plaintiff's Motion for Judgement [sic] on the Administrative Record [Doc. 26] will be **DENIED**, U.S. Bank's Motion for Judgment on the Record [Doc. 23] will be **GRANTED**, and Hartford's Motion for Judgment on the Record [Doc. 20] will be **GRANTED**. Accordingly, this case will be closed.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE